UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HARLEYSVILLE WORCESTER
INSURANCE COMPANY

:
:
:
: CIVIL NO.: 3:11-CV-00578-SRU
:

*Plaintiff*,

v.

PARAMOUNT CONCRETE, INC.;
R.I. POOLS, INC.;
SCOTTSDALE INSURANCE COMPANY

:
:
:
:
:

*Defendants.*

## LIMITED BRIEF OF DEFENDANT / CROSS CLAIM DEFENDANT SCOTTSDALE INSURANCE COMPANY

Scottsdale Insurance Company ("Scottsdale") respectfully submits this limited brief addressing the discrete issue of whether the claims asserted by R.I. Pools, Inc. ("R.I. Pools") in the underlying litigation demonstrate that there were multiple occurrences thereby causing the entire verdict to be covered by the policies issued by Harleysville Worcester Insurance Company ("Harleysville"). Make no mistake, Scottsdale wholly agrees with Harleysville's primary position that there was no occurrence giving rise to coverage under it's, and therefore Scottsdale's, policies. Nevertheless, if this Court disagrees, then it is inescapable that the underlying litigation demonstrates not one, but multiple occurrences.

### I. RELEVANT UNDISPUTED FACTS[1]

Scottsdale issued three Commercial Liability Umbrella Policies to Paramount Concrete, Inc. ("Paramount") with identical terms and conditions (the "Scottsdale Policies"). Scottsdale

---

[1] Summary judgment has not been filed against Scottsdale. Consequently, for the purposes of this Limited Brief, Scottsdale does not respond to the Local Rule 56(a) statements filed by Paramount, R.I. Pool, and Harleysville. If however, this Court should determine that a response was required, Scottsdale reserves the right to respond to those statements, as well as to file its own statement of undisputed and/or disputed facts.

1

Policies, annexed as Exhibit A to Ahlstrand Aff'd. The first policy incepted October 10, 2006, with the last expiring on August 8, 2009. *Id.* Commercial Umbrella Liability coverage is provided under each of the Scottsdale Policies with limits of $5,000,000 each occurrence and a $5,000,000 aggregate. Scottsdale Policies, Form UMS-D-1 (7-02). Attached to each of the Scottsdale Policies is a schedule of underlying insurance. Scottsdale Policies, Form UMS-SP-1 (7-02). Pursuant to that schedule, Harleysville Insurance Group issued the underlying commercial general liability policy in each year with limits of $1,000,000 per occurrence, a $2,000,000 general aggregate limit and a $2,000,000 products completed operations limit (the "Harleysville Policies").[2] *Id.*; Harleysville Policies, p. 3, annexed as Attachment 1 to McKay Aff'd. In essence, and subject to various exclusions, the Harleysville Policies provide coverage for "property damage" caused by an "occurrence" that takes place in the "coverage territory" during the "policy period." Harleysville Policies.

The underlying litigation is a products liability case commenced by R.I. Pools – a pool construction company – against one of its suppliers, Paramount. According to the underlying complaint, as amended, Paramount manufactured, sold and delivered shotcrete (a variation of concrete) to R.I. Pools, which was then used in building numerous pools in Fairfield County. Amended Complaint, annexed as Attachment 17 ¶ 2 to McKay Aff'd. It was further alleged that due to defects in the shotcrete sold by Paramount, these pools cracked. *Id.* at ¶ 4. The jury returned a verdict in favor of R.I. Pools finding that Paramount violated the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m *et seq.* Jury Verdict Form, annexed as Attachment 18

---

[2] Harleysville appears to argue or imply that it issued a single policy for a single policy period of August 9, 2005 to August 9, 2009; that position finds no support in the "policy" attached to Alison L. McKay's affidavit, which clearly reflects that, as is relevant here, the first Harleysville policy was issued on August 9, 2005 and then renewed for the following three years for subsequent one year periods. Harleysville Policies, annexed as Attachment 1 to McKay Aff'd.

to McKay Aff'd. The evidence at trial established that the shotcrete was manufactured in distinct (to order) batches for each pool, and separately delivered. 2/04/11 Tr. Tran., pp. 72-76; 2/07/11 Tr. Tran., pp. 25-26; 2/10/11 Tr. Tran., pp. 14-18; 2/15/11 Tr. Tran., pp. 46-75; Vona Aff'd ¶ 9; Tr. Ex. 22. As noted by the district court in its ruling on punitive damages, in this case:

> There was ample evidence from which the jury could find that some of the shotcrete sold by the defendant was improperly made with masonry sand, rather than concrete sand; that the shotcrete was improperly mixed and delivered by Paramount Concrete using trucks, machines and equipment that were not properly maintained, repaired or equipped; that Paramount knew or should have known that its shotcrete was not in compliance with industry standards, and deviated from product design requirements and recommendations for use in pools, yet made representations to the plaintiff to the contrary which the plaintiff relied upon to its detriment; and that Paramount … operated its concrete plant with personnel who were insufficiently trained and who lacked expertise in the proper mixture and/or grades of ingredients for shotcrete.

12/05/11 Order on Punitive Damages, pp. 3-4, annexed as Attachment 19 to McKay Aff'd. In short, the evidence established that Paramount was "a small, poorly run and poorly equipped company lacking quality control, adequate staff training and equipment maintenance, leading to the delivery of an inconsistent concrete product." *Id.*, p. 9.

In determining whether there is coverage for the verdict, the first question this Court must answer is whether the underlying litigation involved "property damage" caused by an "occurrence." If the Court answers that question(s) in the affirmative, it must then decide, among other things, the number of occurrences at issue in the underlying litigation. This Court granted Scottsdale leave to address that discrete issue because even though there is no motion for summary judgment pending against it, the number of occurrences directly impacts whether the Harleysville Policies have been exhausted and, therefore, whether the Scottsdale Policies may be implicated.

## II. ARGUMENT

There are generally three tests which courts have used in determining the number of

3

occurrences: some courts have concluded that an occurrence is determined by reference to the underlying cause(s) of the damage (the "cause test"); others have concluded that an occurrence is determined based on the effect of the accident; and finally a third group of courts has concluded that an occurrence is determined by reference to the event(s) triggering liability on the part of the insured (the "unfortunate event test").[3] *Metropolitan Life Insurance Company v. Aetna Casualty and Surety Company*, 255 Conn. 295, 313 (2000). There is very little Connecticut case law addressing this issue, particularly with respect to a defective product manufactured, sold and distributed by the insured.

R.I. Pools and Paramount argue that under the "unfortunate event test" adopted by the Connecticut Supreme Court, in *Metropolitan Life Insurance Company v. Aetna Casualty and Surety Company*, 255 Conn. 295 (2000), the underlying litigation involved nineteen occurrences. The basis for that argument, however, is somewhat unclear and inconsistent. While Paramount argues that the failure of each individual pool was a separate occurrence, R.I. Pools appears to adopt that argument, while at the same time arguing that the incorporation of the defective shotcrete into each of the nineteen pools was a separate occurrence. *See* R.I. Pools MOL, pp. 3, 11-12, 25; R.I. Pools Reply, pp. 8, 12; Paramount MOL, pp. 35-36; Paramount Reply, pp. 8-9. Harleysville on the other hand argues that under the "cause test" there was but one occurrence (if any) – the production of defective shotcrete. Harleysville's Obj. to Paramount's MSJ, p. 40.

---

[3] "The 'liability-triggering event' test may be viewed as a specialized application of the 'cause' test. The court still looks to the cause of the injury, but the injury insured against is liability, not property damage or theft. Whenever an insured party is liable to other parties for civil damages, there often will be contemporaneous and related injuries to the insured and to other parties. The test ... focuses the inquiry on the relevant injury and prevents the court from being distracted by these other injuries." *U.E. Texas One-Barrington, Ltd. v. General Star Indem. Co.*, 332 F.3d 274, 279 (5th Cir. 2003), Smith, J., concurring in part, dissenting in part. Thus, some courts have described the "unfortunate event test" as the most practical of the three methods of construction because it "corresponds most with what the average person anticipates when he buys insurance and reads the 'accident' limitation in the policy." *Metropolitan Life*, 255 Conn. 295, 315.

Each of these arguments misses the mark; the number of occurrences, in this case, turns not on the incorporation, failure or mere production of the shotcrete, but rather, on its sale and distribution by Paramount.

First, assuming, as it seems we must, that the Connecticut Supreme Court would extend its ruling in *Metropolitan Life*[4] to a "product seller" such that the number of occurrences is properly determined by the adverse event test, the "adverse event" in this case is Paramount's sale and delivery of defective shotcrete. As is clear from the allegations of the amended complaint, and the evidence ultimately produced at trial, it was the sale and delivery of the defective shotcrete, which gave rise to Paramount's liability. *See e.g., Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374 (6th Cir. 1984) (insured's act of negligence –i.e. possession of contaminated livestock feed did not combine each sale of feed into one occurrence; the shipment of the contaminated feed constituted the act from which liability arose and therefore

---

[4] In *Metropolitan Life*, the insured-plaintiff health insurer, Metropolitan Life, sought coverage under excess insurance policies issued to it by the defendant-insurers. Metropolitan Life was a large mutual insurance company that insured employee health care plans of various manufacturers and distributors of asbestos and products containing asbestos. Metropolitan Life had been named in thousands of lawsuits seeking recovery for asbestos-related bodily injuries resulting from its alleged failure to publicize the health risks of asbestos exposure. Many of the underlying claimants were industrial / construction workers who were not Metropolitan Life policyholders or persons who worked in the plants where Metropolitan Life conducted its studies. Liability was predicated on a claim that Metropolitan Life's assumed a duty to disclose to the general public when it undertook research regarding the safety of asbestos. 255 Conn. at 289-299. The specific question before the Connecticut Supreme Court was whether, under the circumstances presented, there was one occurrence – i.e. Metropolitan Life's failure to warn of the dangers of asbestos exposure, which resulted in bodily injury to the underlying claimants - or whether each claimant's exposure was a separate occurrence. *Id.* at 298. Applying New York and Connecticut law the Court adopted and applied the adverse event test and found that the occurrence was each claimant's initial exposure to asbestos and not Metropolitan Life's alleged failure to warn. *Id.* 304-305. The Court then went on to find that there were several occurrences because the exposures to asbestos spanned a period of sixty years at several different places. *Id.* at 305, 316-17. It also noted that Metropolitan's failure to warn was inconsistent with the plain and ordinary meaning of the term occurrence in that it was more akin to a conscious pattern of behavior / conduct then an event that took place unexpectedly and without design. *Id.* at 308, n.15.

5

each shipment was a separate occurrence); *American Red Cross v. Travelers Indemnity Co of R.I.*, 816 F. Supp. 755 (D.D.C. 1993) (finding general negligent practice of handling HIV-contaminated blood is not one occurrence, rather each distribution of contaminated blood was a separate occurrence, no liability could attach until the blood was distributed); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.*, 447 F. 2d 204 (5th Cir. 1971) (sale of contaminated birdseed subjected insured seller to liability; if the insured had destroyed the seed before sale there would have been no occurrence at all for which the insured would be liable); *Mason v. Home Ins. Co. of Illinois*, 177 Ill. App. 3d (1988) (finding each sale / service of tainted food to a patron was a separate occurrence and rejecting argument that the improper preparation of the tainted food was not the occurrence, so long as the insured retained possession of the food no liability could result). Because each sale / delivery by Paramount was made for and to nineteen different properties over the course of several years, they constitute separate occurrences.

This Court's decision in *Champion Int'l Corp. v. Cont'l Cas. Co.*, 546 F.2d 205 (2d Cir. 1976) does not change this result. Admittedly, in *Champion,* this Court found that the sale of defective vinyl covered paneling was a single occurrence. However, the Court expressly did not reach the issue of whether each delivery to the twenty-six customer-manufacturers might constitute separate occurrences, because, unlike R.I. Pools, those customers had not sought indemnification. Therefore, the Court limited its analysis to two possibilities: the 1,400 vehicles in which the products were installed or what the Court viewed as a single delivery of products, and did not reach the question presently before the Court. *See Stonewall Insurance Company v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1213-1214 (2d Cir. 1995). As such, while *Champion* instructs that the proper focus is on the sales / deliveries, in this case, it leads to a finding of multiple occurrences.

6

Second, even if this Court looks further back up the causal chain and determines that production of defective shotcrete was the "adverse event" subjecting Paramount to liability, the result is the same; that is, there would still be nineteen occurrences. In this case, there was not one singular production of defective shotcrete. Rather, Paramount produced a separate and distinct batch of shotcrete, to order, for each of the nineteen properties at issue. Thus, there were nineteen productions, i.e., occurrences. For the same reason, even if Harleysville is correct and the cause test is the appropriate method for determining the number of occurrences, there are still nineteen occurrences. In this case, the "production" of defective concrete simply was not a continuous production and sale of a single defective product nor did all of the alleged property damage result from one, proximate, uninterrupted and continuing cause. *Michigan Chemical Corp.*, F.2d 374, 383 ("The shipment of the substance constituted the act from which liability arose. Other shipments ... created additional exposure to liability and therefore were separate occurrences. In such a situation, there would not have been one uninterrupted and continuing case but several distinct acts from which liability would have resulted.").

### III. CONCLUSION

In short, if this Court finds that the claims in the underlying litigation constitute an "occurrence" then it necessarily must also find that there were nineteen occurrences.

Dated: West Hartford, Connecticut
November 15, 2012

**DEFENDANT,
SCOTTSDALE INSURANCE COMPANY**

By: /S/ Elizabeth F. Ahlstrand
Mark B. Seiger, Esq. (ct05580)
Elizabeth F. Ahlstrand, Esq. (ct27173)
*Attorney for the Defendant*
Scottsdale Insurance Company
65 Memorial Road / Suite 340
West Hartford, CT 06107
Phone (860) 760-8400
Fax (860) 760-8401
mseiger@sgllawgroup.com
eahlstrand@sgllawgroup.com

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November 2012, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

James A. Budinetz
McElroy, Deutsch, Mulvaney & Carpenter, LLP
One State Street, 14th Floor
Hartford, CT 06103
860-522-5175

Claudia A. Baio
James A. Mongillo
Baio & Associates
15 Elm Street
Rocky Hill, CT 06067
860-571-8880

Law Offices of Paul A. Lange
80 Ferry Blvd.
Stratford, CT 06615-6079
203-375-7724

Bai, Pollock, Blueweiss & Mulcahey
Two Corporate Dr.
Shelton, CT 06484

By:   /S/ Elizabeth F. Ahlstrand
      Elizabeth F. Ahlstrand

4833-9189-2753, v. 1