# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Harleysville Worcester Ins. Co., <br> Plaintiff, <br><br> v. <br><br> Paramount Concrete, Inc., R.I. Pools Inc., <br> and Scottsdale Ins. Co., <br> Defendants. | No. 3:11cv578 (SRU) |

## RULING ON DEFENDANTS PARAMOUNT CONCRETE'S AND R.I. POOLS' MOTIONS FOR SUMMARY JUDGMENT

This is an insurance coverage action relating to claims for damage to swimming pools constructed with defectively produced concrete, known as "shotcrete."  Plaintiff Harleysville Worcester Insurance Company ("Harleysville") has brought this declaratory judgment action pursuant to 28 U.S.C. §§ 2201 and 1332(a)(1), against defendant Paramount Concrete ("Paramount"), defendant R.I. Pools, and Paramount's excess liability insurer, defendant Scottsdale Insurance Company, seeking a declaration that it has no duty to indemnify Paramount in its underlying litigation brought by R.I. Pools.  *See* Harleysville Compl. (doc. # 1).  Paramount and R.I. Pools have both moved for partial summary judgment on the issue of coverage (docs. # 78 and 94).

### I.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)

(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant

or unnecessary will not be counted. *Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

## II.    Background

In May 2009, R.I. Pools commenced a products liability lawsuit in Connecticut Superior Court against Paramount, a manufacturer and supplier of shotcrete, after approximately nineteen pools built by R.I. Pools and incorporating Paramount's shotcrete cracked, causing extensive damage to the pools. The case went to trial and on February 17, 2011, the jury returned a verdict in favor of R.I. Pools, awarding compensatory damages of $2,760,207.90. The jury also found that R.I. Pools was entitled to punitive damages, because Paramount had acted "with a reckless disregard for the safety of product users, consumers and others who were injured by the product." Subsequently, the court awarded punitive damages in the form of attorneys' fees. Paramount Mem. Supp. Summ. J. 2-6 (doc. # 79); R.I. Pools Local Rule 56(a)(1) Statement (doc. #95); Harleysville Mem. Opp. Summ. J. 5-9 (doc. # 117).

3

Prior to entering the shotcrete business, Paramount purchased a Commercial General Liability ("CGL") insurance policy from Harleysville.  The CGL policy obligates Harleysville to defend any claim and indemnify any judgment against Paramount if the cause of action is covered by the policy.  Included in the scope of coverage is "property damage" caused by an "occurrence," which the policy defines as "an accident, including continuous or repeated exposure to substantially the same harmful conditions."  The policy compensates Paramount for up to one million dollars in damages per occurrence, and two million dollars total. Harleysville defended Paramount in its litigation with R.I. Pools, but reserved the right to contest coverage in the event of an unfavorable judgment.  *See id.*

Shortly after the verdict in the underlying litigation, Harleysville filed this declaratory judgment action, asking the Court to rule that: (1) Paramount's insurance policy did not provide coverage for the damages awarded in the underlying litigation; and (2) even if it otherwise would, several exclusions bar coverage.  Harleysville Compl. ¶¶ 31-34.  Paramount filed a counterclaim also seeking a declaratory judgment, and seeking damages for Harleysville's alleged bad faith defense in the underlying action and violations of the Connecticut Unfair Trade Practices Act.  Paramount Am. Countercl. (doc. # 59).  Paramount and R.I. Pools move for partial summary judgment on the issue of coverage.

## III.   Discussion

Under the law of Connecticut, which governs this diversity action, construction of an insurance contract presents a question of law.  *Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 274 Conn. 457, 462 (2005); *Am. Home Assurance Co. v. Abrams*, 69 F. Supp. 2d 339, 348 (D. Conn. 1999).  In an insurance case, it is the function of the court to interpret the provisions of the contract and, "if no material facts are at issue, the question of whether coverage exists . . . is

4

appropriately decided on a motion for summary judgment." *Peerless Ins. Co. v. Disla*, 999 F. Supp. 261, 263 (D. Conn. 1998).

Insurance policies are construed according to general rules of contract interpretation. *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990); *Middlesex Ins. Co. v. Mara*, 699 F. Supp. 2d 439, 446 (D. Conn. 2010). If the terms of an insurance policy are clear and unambiguous, they must be accorded their ordinary meaning. *Stack Oil*, 922 F.2d at 121. When the terms of an insurance contract are "susceptible of two equally responsible interpretations," however, the court should construe the words to provide coverage for the loss. *Heyman Assocs. No. 1 v. Ins. Co. of the Pa.*, 231 Conn. 756, 770 (1995).

The insured bears the burden of establishing coverage. *Yale Univ. v. Cigna Ins. Co.*, 224 F. Supp. 2d 402, 411 (D. Conn. 2002). Once an insured produces evidence of a covered loss, the burden ordinarily shifts to the insurance company to prove that an exclusion applies to limit or bar coverage. *Id.* at 412; *see also McCormick & Co. v. Empire Ins. Grp.*, 878 F.2d 27, 30 (2d Cir. 1989). At the summary judgment stage Harleysville, as the nonmoving party, may defeat Paramount and R.I. Pools' motions by raising a genuine issue of material fact regarding the scope of coverage or applicability of an exclusion.

A. <u>The Scope of the CGL Policy</u>

Paramount's policy requires Harleysville to pay "those sums that [Paramount] becomes legally obligated to pay as damages" because of "property damage" caused by an "occurrence" that takes place in the "coverage territory" during the policy period. CGL Policy, Section I.1(a)-(b) (doc. # 82-3). Paramount and R.I. Pools assert that all material issues of fact were resolved in the underlying litigation and that coverage is established as a matter of law. Harleysville, by contrast, argues that summary judgment must be denied, because there was no "occurrence"

under the policy (or, alternatively, that there was only one occurrence) and the existence, scope, and timing of any property damage remains to be litigated.

Paramount's policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  CGL Policy, Section V.13.  "Accident" is not defined, but the Connecticut Supreme Court has interpreted this term to mean "an unforeseen unplanned event" "occurring without intent or volition" and "producing an unfortunate result."  *Vermont Mut. Ins. Co. v. Walukiewicz*, 290 Conn. 582, 594 (2009) (citing *Safeco Ins. Co. of America v. Tunkle,* 997 F. Supp. 1356, 1357 (D. Mont. 1998)); *see also Hammer v. Lumberman's Mut. Cas. Co.*, 214 Conn. 573, 590 (1990) (an accident is "an unintended occurrence"); *Commercial Contractors Corp. v. Am. Ins. Co.*, 152 Conn. 31, 42 (1964) (an accident is "an unexpected happening").  The "accident" is "the event causing injury, not the cause of that event."  *Commercial Contractors*, 152 Conn. at 42-43.  Therefore, in determining whether an "occurrence" has taken place, Connecticut courts look to the last event in the causal chain causing injury.  *Metropolitan Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 255 Conn. 295, 312 (2001).

The phrase "continuous exposure" broadens the term "occurrence" "beyond the word 'accident' to include a situation where damage occurs (continuously or repeatedly) over a period of time," rather than suddenly or instantaneously, as the word "accident" typically suggests.  *Id.* at 307-08 (quoting *Champion Int'l Corp. v. Continental Cas. Co.*, 546 F.2d 502, 507-08 (2d Cir. 1976) (Newman, J., dissenting)).  It covers "claims that occur 'when people or property are physically exposed to some injurious phenomenon such as heat, moisture, or radiation . . . [at] one location.'"  *Id.* at 311.  The phrase, however, does not eliminate the requirement of a causal chain – i.e., the "property damage" itself cannot be the "occurrence" for which the insured seeks

coverage.  *Jakobson Shipyard, Inc. v. Aetna Cas. & Sur. Co*., 961 F.2d 387 (2d Cir. 1992); *Providence Washington Ins. Grp. v. Albarello*, 784 F. Supp. 950 (D. Conn. 1992).

The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  CGL Policy, Section V.17.  Where an insured "unintentionally sells a defective product that is incorporated into a third-party's finished product, the resulting impairment to the third-party's product" constitutes an "occurrence" that causes "property damage."  *Chubb Ins. Co. of N.J. v. Hartford Fire Ins. Co.*, No. 97 CIV. 6935 LAP, 1999 WL 760206, at *4 (S.D.N.Y. Sept. 27, 1999), *aff'd*, 229 F.3d 1135 (2d Cir. 2000) (incorporation of impure juice concentrate into juice drink was an "occurrence" that caused "property damage" because concentrate caused finished drink to become impure); *see also Maryland Cas. Co. v. W.R. Grace & Co.*, 23 F.3d 617, 624-27 (2d Cir. 1993) (installation of asbestos in buildings was an "occurrence" within meaning of CGL policy); *Aetna Cas. & Sur. Co. v. Gen. Time Corp.*, 704 F.2d 80 (2d Cir.1983) (incorporation of defective motor into radiator valve that caused valve to malfunction was an "occurrence"); *Nat. Union Fire Ins. Co. of Pittsburgh v. Terra Ind., Inc.*, 216 F. Supp. 2d 899, 918-19 (N.D. Iowa 2002) (incorporation of benzene-contaminated carbon monoxide into finished carbonated beverages was an "occurrence" causing "property damage," because carbon dioxide could not be removed from the beverages and rendered the entire beverage unusable); *Shade Foods, Inc. v. Innovative Products Sales & Mktg., Inc.*, 78 Cal. App. 4th 847, 865 (2000) (incorporation of almonds containing wood splinters into nut cluster cereal caused "property damage" because the nut clusters could not be "somehow deconstructed to remove the injurious splinters and then recombined for their original use"); *see also Cont'l X-Ray Corp. v. Home Indem. Co.*, No. 96 C 5250, 1997 WL 102537, at *5 (N.D. Ill. Mar. 5, 1997) ("[I]f an insured's defective product has been integrated into a larger

mechanism, and that defect results in damage to the completed product, property damage occurs for the purposes of a commercial general liability policy." (citing *Travelers Ins. Co. v. Penda Corp.*, 974 F.2d 823, 831 (7th Cir. 1992))).

"[T]he mere presence of a defective part causing no immediate harm," however, is not covered under a CGL policy. *Times Fiber Commc'ns, Inc. v. Travelers Indem. Co.*, No. X05–CV–03–0196619S, 2005 WL 589821, at *6 (Conn. Super. Ct. Feb. 2, 2005). Although the distinction may be difficult to draw, the key factor in is whether the insured's defective product caused physical damage to the larger product or system. In other words, incorporation of a defective component into a larger structure does not give rise to coverage under a CGL policy "*unless and until the defective component physically injures some other tangible part of the larger system or the system as a whole.*" *Times Fiber*, 2005 WL 589821 at *6 (citing *Watts Indus., Inc. v. Zurich Am. Ins. Co.*, 121 Cal. App. 4th 1029, 1035 (2004) (emphasis in original)). On certification from the Northern District of Alabama, the Connecticut Supreme Court recently held that this logic applies to claims for faulty workmanship as well. *See Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 784-85 (2013) ("[P]hysical injury to tangible property would not include construction deficiencies unless they damage other, nondefective property.").

In *Times Fiber* the insured sold millions of feet of cable to a third party, which the third party installed in its building. 2005 WL 589821, at *1. Nothing went wrong with the cable; however, the third-party had to remove it from the building after being notified by the building inspector that the cable did not meet the applicable building code. *Id.* The third-party sued the insured for the sizable costs of removal and replacement and the insured, in turn, instituted an action against the insurer, which had denied coverage. *Id.* at *1-2. The trial court held that there was no "occurrence," because the only alleged "accident" was the shortcoming of the product

itself, and no "property damage," because any and all harm to the buildings was caused only by the intentional removal of the cables. *Id.* at *6. Similarly, in *Capstone Building*, the Connecticut Supreme Court held that "building code violations, defective construction and poor quality control" would not constitute "physical injury to tangible property," "unless they result in damage to other, nondefective property" and, consequently, that the insured's CGL policy "cover[ed] claims for property damage caused by defective work, but not claims for repair of the defective work itself." *Capstone Bldg. Corp.*, 308 Conn. at 783, 787.

Harleysville views this situation as analogous to *Times Fiber*, in that "the event causing most, if not all, of the alleged property damage, was or will be the intentional repair and replacement efforts." Harleysville Summ. J. Opp. 14. It argues that there is no covered "property damage," because the failure of the shotcrete did not cause structural damage to the pools or surrounding property; the only "property damage" that occurred was caused by removal of the shotcrete in an attempt to repair the pools. *Times Fiber* is distinguishable, however, because the defective cables in that case had not yet failed. The damage caused by the repairs was not covered because the insured's product itself had not caused any harm. 2005 WL 589821, at *6-8. Here, by contrast, the failure of Paramount's defective product caused harm to a larger system. The liquid shotcrete, once it dried, became inextricably intertwined with other components such as rebar and coping, which combined to create finished pools. The defective shotcrete, in turn, caused cracking that resulted in the failure of those pools. *See* McKay Aff. Att. 10, Trial Tr. 140, Feb. 9, 2011 (doc. # 83-4) (engineer testimony that the pool was designed to withstand cracking, but that the defective shotcrete prevented that from happening); McKay Aff. Att. 12, Trial Tr. 63-64, Feb. 14, 2011 (doc. # 83-6) (engineer testimony that defective shotcrete would prevent the steel in the pool from properly performing its function of taking

tensile loads); McKay Aff. Att. 13, Trial Tr. 90; 120, Feb. 15, 2011 (doc. # 83-7) (engineer testimony that concrete is an integral part of the pool wall and failure of concrete can lead to failure of pool wall, and that steel in a pool needs a good bond with concrete to function).[1]

Harleysville also cites *Scottsdale Ins. Co. v. R.I. Pools, Inc.*, 742 F. Supp. 2d 239, 246 (D. Conn. 2010), *rev'd*, 710 F.3d 499 (2d Cir. 2013), and *Aquatectonics, Inc. v. Hartford Cas. Ins. Co.*, No. 10-CV-2935, 2012 WL 1020313, at *6 (E.D.N.Y. Mar. 26, 2012), for the proposition that there was no "occurrence" because Paramount's product, the shotcrete, was the only thing damaged. Both *R.I. Pools* and *Aquatectonics* involved damage to pools allegedly caused by defective workmanship – *R.I. Pools*, in fact, involved the very same pools at issue in this case. Additionally, both cases involved CGL policies whose relevant provisions appear to have been identical to those contained in Paramount's policy.

In *R.I. Pools* and *Aquatectonics*, the district judges relied heavily on *Jakobson Shipyard*, a case where a shipbuilder sold a tugboat with a defective steering mechanism and unsuccessfully sought indemnification for damages awarded in the buyer's "faulty workmanship" action. 961 F.2d at 388. In that case, the Second Circuit held that there was no "occurrence," because the words "accident" and "continuous or repeated exposure to conditions" could not be construed to "encompass[] damage to a product resulting from the product's failure to perform according to contract specifications." *Id.* at 389. Consequently, the district judges in both *R.I. Pools* and *Aquatectonics* held that there was no "occurrence" causing property damage to the pools, because faulty workmanship was not an "accident" and the only thing damaged was

---

[1] Interestingly, several months before disclaiming coverage for the failure of these pools, the same Harleysville adjuster determined that there was no coverage for Paramount's defective shotcrete in a different project. *See* McKay Aff. Att. 21, Harleysville Internal Emails (doc. # 85-1). In the earlier situation, Harleysville denied coverage because Paramount's concrete failed a "strength test," and had to be replaced. *Id.* At the time the defect was discovered, however, it appears from the record that no actual harm had occurred. *See id.* If, in fact, that is what happened, the difference between the earlier situation and the present case would provide a near-perfect illustration of the distinction between cases like *Times Fiber*, where there is no coverage, and those like *Chubb*, where coverage exists because the defect in the component causes the finished product to fail.

the insured's own work.  *R.I. Pools*, 742 F. Supp. 2d at 246; *Aquatectonics*, 2012 WL 1020313, at *6.

The law has changed since Harleysville filed its brief, however, and its reliance on both *R.I. Pools* and *Aquatectonics* is now misplaced.  First, the Second Circuit overturned *R.I. Pools*, holding that the district court incorrectly conflated the initial determination of coverage, i.e., whether there was an "occurrence," and the separate question whether an exclusion applied.  710 F.3d at 491-92.  The Court distinguished *Jakobson Shipyard* on the grounds that the policy in that case did not contemplate a situation where the insured's "work" might be covered, whereas the policy in *R.I. Pools* contained a "your work" exclusion with a subcontractor exception.  *Id.* The existence of the "your work" exclusion and subcontractor exception clearly indicated that the insured's own work might be covered under the policy in certain circumstances.  *Id.* at 492. Therefore, defects in the insured's work were not precluded from the definition of "occurrence"; instead, the issue of coverage turned on whether the "your work" exclusion, discussed below, applied.  *Id.*  Paramount's policy contains a "your work" exception with a subcontractor exclusion; therefore, the district court opinions in *R.I. Pools* and *Aquatectonics* are not persuasive after the Second Circuit's decision in *R.I. Pools*.

Second, in *Capstone Building*, the Connecticut Supreme Court expressly held that "defective workmanship can give rise to an 'occurrence'" under an identical CGL policy and that damage to the insured's own work was not excluded from the definition of "property damage" under the plain language of the policy.  308 Conn. at 776-77.  As in *R.I. Pools*, the Court reasoned that damage to the insured's own work might be barred by the "your work" exclusion, but the applicability of that exclusion did not affect the initial determination of coverage.  *Id.* at

787-90.  Thus, even if the Second Circuit had not overturned the district court's holding in *R.I. Pools*, Connecticut law directly contradicts the position taken by Harleysville.

In sum, neither of the arguments advanced by Harleysville precludes coverage in this case.  Paramount's defective shotcrete was incorporated into R.I. Pools' finished product, and caused the finished product to crack and leak.  *See* McKay Aff. Att. 11, Trial Tr. 86-87, Feb. 10, 2011 (doc. # 83-5).  This case falls squarely within the category of defective component cases where courts have found an "occurrence" causing "property damage."  *See, e.g.*, *Gen. Time Corp.*, 704 F.2d at 82; *Chubb*, 1999 WL 760206, at *4, *aff'd*, 229 F.3d 1135; *Terra*, 216 F. Supp. 2d at 918-19.  Whether any exclusion(s) might apply to bar coverage is separate from the initial determination of coverage – and will be discussed below.

    B.  <u>The CGL Policy's Exclusions</u>

Paramount and R.I. Pools have met their burden of establishing coverage.  The next question is whether one or more exclusions in the policy nonetheless bars coverage in this case. Paramount and R.I. Pools move for summary judgment on each of the exclusions that Harleysville relies upon in disclaiming its duty to indemnify.  The exclusions at issue are Exclusion a, which bars coverage for "expected or intended" injury, and several "business risk" exclusions, designed to prevent an insurer from becoming a surety for the insured's defective work or product.  *See, e.g.*, *Bonded Concrete, Inc. v. Transcon. Ins. Co.*, 784 N.Y.S.2d 212, 213 (3d Dep't 2004).  The exclusions ensure that a CGL policy covers "tort liability resulting from the product and/or work of the insured company" without serving as a warranty on the quality of the work or product itself.  *Am. Ins. Co. v. Crown Packaging Int'l*, 813 F. Supp. 2d 1027, 1046 (N. D. Ind. 2011); *see also George A. Fuller Co. v. United States Fid. & Guar. Co.*, 613

N.Y.S.2d 152 (1st Dep;t 1994); *Fireman's Fund Ins. Co. v. Amstek Metal, LLC*, No. 07 C 647, 2008 WL 4066096 (N.D. Ill. Aug. 27, 2008).

Paramount and R.I. Pools assert that the damage to the pools caused by Paramount's shotcrete was an unintentional and unexpected tort that is clearly covered under the policy. Harleysville argues that the Paramount might have expected the shotcrete to fail and that, regardless, the only real damage was to Paramount's work or product.

        i.  *Exclusion a: Expected or Intended Injury*

Exclusion a eliminates coverage for "bodily injury" or "property damage" that is "expected or intended from the standpoint of the insured." CGL Policy, Section I.2(a). The application of this exclusion closely tracks the issue whether there has been an "occurrence," because intended or expected injury or damage hardly constitutes an "accident." *See, e.g.*, *Albarello*, 784 F. Supp. at 953 (noting that the limitation is "perhaps redundant," because "an event that *did* result in intended or expected damage would presumably not be an 'accident'"). Indeed CGL policies historically have incorporated the language of Exclusion a into the general provisions on coverage. *See, e.g.*, *Jakobson Shipyard*, 961 F.2d at 389 ("'Occurrence' is defined by the policies as 'an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.'"); *Albarello*, 784 F. Supp. at 953 (same). Nevertheless, the parties devote significant attention to the scope of this exclusion, because of the jury's finding that Paramount acted with "reckless disregard" for the safety of others. Although the underlying products liability action sought damages for negligence, Harleysville asserts that the jury's finding of "recklessness" indicates a level of culpability that raises a question of fact regarding the application of Exclusion a.

In applying virtually identical exclusions, both the Connecticut Supreme Court and the Second Circuit have emphasized that the subjective intent of the insured rather than what an objectively "reasonable person" would have foreseen is determinative.  *See, e.g.*, *Walukiewicz*, 290 Conn. at 597 (explaining that the "expected or intended injury" exclusion "is triggered when the insured subjectively expects or intends that [the] injury will occur, and not merely when an ordinary, reasonable person would be able to foresee injury occurring as a result of his acts"); *City of Johnstown v. Bankers Standard Ins. Co.*, 877 F. 2d 1146, 1150 (2d Cir. 1989) (applying analogous New York law and finding that "[i]n general, what make injuries or damages expected or intended rather than accidental are the knowledge and intent of the insured.").  "Intended" damage "results from an act done for the purpose of causing the injury or with knowledge that the injury is substantially certain to follow." *Rogers v. Doody*, 119 Conn. 532, 535 (1935); *see also Mingachos v. CBS, Inc.*, 196 Conn. 91, 101 (1985).  It is not enough that the injury-producing act was intentional; the injury itself must have been intended by the insured.  *See id*.

"Expected" is akin to "constructive intent."  Expected injury occurs where the insured, although not acting with the purpose to cause injury, must have known that "the damages would flow directly and immediately from its intentional act." *Johnstown*, 877 F.2d at 1150; *see also Abarello*, 784 F. Supp. at 954; *Am. Ins. Co. v. Saulnier*, 242 F. Supp. 257, 259-60 (D. Conn. 1965).  In *Johnstown*, this meant that even though an insured party ignored warnings of hazardous dumping, it could not be found to have intended or expected to pollute a park in violation of federal law.  877 F.2d at 1151.  The Second Circuit justified this limitation by noting that "[i]t is apparent that to do otherwise, and to exclude all losses or damages which might in some way have been expected by the insured, could expand the field of exclusion until virtually no recovery could be had on insurance."  *Id.* at 1150.

14

In the underlying litigation, R.I. Pools alleged that Paramount's conduct was "egregious," and created a "high probability of causing substantial injury to product users, and consumers . . . and their respective property."  *See* McKay Aff. Att. 17, R.I. Pools Am. Compl. ¶¶ 7-8 (doc # 84-4).  The jury agreed, finding that Paramount acted "with a reckless disregard for the safety of product users, consumers or others who were injured by the product."  McKay Aff. Att. 18, Jury Verdict Form (doc. # 84-5).  Recklessness, however, is not akin to "expectation" as a matter of law.  An actor acts recklessly when he knows or should have known that "there is a strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless."  *See Mingachos*, 196 Conn. at 103 (citing Restatement (Second) of Torts § 500 cmt f (1965)).  The existence of a "strong probability" of harm does not necessarily indicate that the insured "must have known" that the harm would directly and immediately result.  *Johnstown*, 877 F.2d at 1150.

Nothing in the record indicates that Paramount intended to do a shoddy job or even that it expected any harm to result from use of its product.  The evidence at the underlying trial established that Paramount had no quality control system, that its employees simply "eyeballed" the correct proportions for its shotcrete mix, that it had problems with its trucks, that none of the owners or executives had any experience with concrete, that there were no corporate meetings, and that the plant supervisor (or "batchman") did not feel adequately trained.  *See generally* Trial Tr. (docs. # 82-84).  Those factors point to severe deficiencies in its operations, and were enough for the jury to conclude that Paramount acted "recklessly."  But they do not prove that Paramount actually or constructively knew, much less intended, that its shotcrete would fail.  Based on the trial record, the cracked and leaking pools appear to have been "unforeseen

unplanned event[s]" that "occur[ed] without intent or volition" and "produc[ed] an unfortunate result." *Walukiewicz*, 290 Conn. at 594.

Harleysville, however, has not had a chance to litigate this issue and should not be bound by the record at the underlying trial. Liability in the underlying action did not depend on what Paramount actually or constructively intended; consideration of its subjective state of mind was unnecessary to find either negligence or recklessness. Because the jury's conclusion that Paramount acted recklessly neither establishes nor precludes a finding of "expected" or "intended" injury as a matter of law, Harleysville should have the opportunity to present the facts to a jury in this case.

ii. *Exclusion k: The "Your Product" Exclusion*

Exclusion k applies to "'property damage' to 'your product' arising out of it or any part of it." CGL Policy, Section I.2(k). "Your product" is defined in relevant part as "goods or products, other than real property, manufactured, sold, handled, distributed or disposed of" by the insured or a related entity, and includes "warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" *Id.* Section V.21. The "your product" exclusion clearly applies to damage to the insured's own product, but it does not apply to "damage caused by the insured's product to persons or property other than the insured's own product.'" *Tradin Organics USA, Inc. v. Maryland Cas. Co.*, 325 F. App'x 10, 11 (2d Cir. Apr. 16, 2009), *cert denied*, 130 S. Ct. 744 (2009) (citing *Lowville Producer's Dairy Coop. v. Am. Motorists Ins. Co.*, 604 N.Y.S. 2d 421, 422 (4th Dep't 1993); *Hartog Rahal P'ship v. Am. Motorists Ins. Co.*, 359 F. Supp. 2d 331, 333 (S.D.N.Y. 2005)).

Under Exclusion k, Paramount's product is the shotcrete itself and not the larger pool into which it was incorporated. *See, e.g.*, *Fireman's Fund*, 2008 WL 4066096, at * 10 ("Amstek's

product may be considered its wire – not the springs Wallbank created from that wire, or the

transmission spring packs into which Wallbank incorporated those springs."); *Travelers Indem.*

*Co. v. Dammann & Co., Inc.*, No. CIV. 04-5699DRD, 2008 WL 370914, at \*9 (D. N.J. Feb. 11,

2008) ("In this case, the damage is to IFF's product – the vanilla extract – and not to . . .

Dammann's product – the vanilla beans . . . an important ingredient for IFF's product."); *Emp'rs*

*Mut. Cas. Co. v. Grayson*, No. CIV-07-917-C, 2008 WL 2278593, at \*6 (W.D. Okla. May 30,

2008) (holding, in case involving supplier of non-conforming concrete, that damage resulting to

other property from non-conforming concrete, including loss-of-use damage to bridge and

physical injury to component parts during removal process, was not excluded from coverage").

Harleysville asserts that this exclusion nonetheless applies, because the only damage was to

Paramount's product, the defective shotcrete.  It argues that the pools and surrounding landscape

and hardscape were or will be damaged only during the process of repairing the shotcrete.

Harleysville Summ J. Opp. 12-15.  Paramount and R.I. Pools, by contrast, maintain that the

failure of the shotcrete itself caused damage to the finished pools and surrounding property.[2]

The underlying litigation conclusively established that Paramount's shotcrete caused the

finished pools to crack and leak.  That issue was fully litigated at trial, and it was necessary to

the jury's finding of liability.  The record is clear that the damage that occurred was not *to*

Paramount's product; the damage was *caused* by Paramount's product.  *See* McKay Aff. Att. 10,

Trial Tr. 140, Feb. 9, 2011 (engineer testimony that defective shotcrete prevented pool from

withstanding cracking); McKay Aff. Att. 12, Trial Tr. 63-64, Feb. 14, 2011, (engineer testimony

---

[2] Paramount also asserts that the "your product" exclusion does not apply, because the exclusion does not apply to "real property" and the damage to the pools was damage to "real property."  *See* Paramount's Mem. Supp. Summ J. 18-20.  As Harleysville notes, that argument is patently incorrect.  By the terms of the policy, the "your product" exclusion does not apply where the insured's product is real property.  There is no dispute that Paramount's product – the shotcrete – is not real property, whether or not coverage for the property damaged – the pools – would be barred by Exclusion k.

that defective shotcrete would prevent the steel in the pool from taking tensile loads).  Although

the trial record does not conclusively establish whether the defective shotcrete caused harm to

the surrounding property, independent of the repairs, it is clear that the "property damage" that

occurred was to property other than Paramount's "product."  *See, e.g.*, *Dammann & Co*, 2008

WL 370914, at *9 ("[T]he damage is to IFF's product – the vanilla extract – and not to any

product produced by Dammann.  Although Dammann's product – the vanilla beans – provides

an important ingredient for IFF's product, IFF's product is distinct for these purposes, and the

["your property" exclusion] do[es] not apply.").  Accordingly, summary judgment is granted

with respect to Exclusion k.

### iii.   *Exclusion l: The "Your Work" Exclusion*

Exclusion l exempts from coverage "property damage to your work arising out of it or

any part of it and included in the products-completed operations hazard."  CGL Policy, Section

I.2(l).  The policy defines "your work" as "work or operations performed by you," "materials,

parts or equipment furnished in connection with such work or operations," and "warranties or

representations made at any time with respect to the fitness, quality, durability, performance or

use of 'your work.'"  *Id.* Section V.22.  The "products-completed operations hazard" includes

damage "occurring away from premises you own or rent and arising out of your work," but

excludes products that are still in the insured's possession and work that has not yet been

completed.  *Id.* Section V.16.

It is undisputed that Paramount's role in the construction of the pools was limited to

mixing the shotcrete and delivering that product to the pool construction site.  Paramount did not

even shoot the shotcrete into the pools – that was done by subcontractors separately hired by R.I.

Pools.  McKay Aff. Att. 7, Trial Tr. 41; 76-78, Feb. 4, 2011 (doc. # 82-8).  Harleysville

nevertheless treats the creation of Paramount's product as its "work," and argues that this work

was completed at the time Paramount delivered the shotcrete to the construction site. Harleysville Opp. Summ. J. 29.

By defining "your work" as "work" or "operations," Exclusion l appears to relate to services, not goods. Neither the Second Circuit nor the Connecticut Supreme Court has conclusively determined whether the "your work" exclusion applies in a case involving a product. *See Tradin Organics*, 325 F. App'x at 10 (finding, in case involving supply of defective product, that because the "your product" exclusion applied, the applicability of the "your work" exclusion was irrelevant). Notably, a leading insurance-law treatise distinguishes between "your work" and "your product." 9A Couch on Ins. § 129:19 (2013) ("Just as the primary purpose of the 'your work' exclusion is to prevent liability policies from insuring against an insured's own faulty workmanship, the 'your product' exclusion is to prevent liability policies coverage for damage to the insured's own product."); *see also Flint v. Universal Mach. Co.*, 238 Conn. 637, 645 (1996) (holding, in analysis of products-completed operations hazard, that "the 'hazard' to be excluded is that arising from *either* products once out of the insured's possession, *or* from the insured's work once completed."). Additionally, the cases applying the "your work" exclusion typically involve claims against contractors for defective work product. *See, e.g.*, *Capstone Bldg.*, 308 Conn. at 790 (finding, in case involving defects in college dormitory constructed by contractor, that "entire Hilltop [dormitory] project meets the definition of 'your work' because it was completed by the plaintiffs or their subcontractors"); *Wilshire Ins Co. v. RJT Const., LLC*, 581 F.3d 222, 226 (5th Cir. 2009) ("The ["your work"] exclusion precludes coverage for the cost of repairing RJT's own work, the foundation.").

At least one court, however, has held that an insured's "work" includes the products it supplies and the warranties it makes. *St. Paul Fire & Marine Ins. Co. v. Futura Coatings, Inc.*,

993 F. Supp. 1258, 1263 (D. Minn. 1998) ("Futura's work includes the products supplied to Universal for application to the basins and statements made by Futura concerning the fitness, quality, durability, or performance of the products.").  But even assuming the definition of "your work" encompasses the labor involved in producing a product, Exclusion l does not preclude coverage here.  If the defective shotcrete is Paramount's "work" as well as its "product," then Exclusion l does not bar coverage for the exact same reason that Exclusion k does not bar coverage: Paramount's shotcrete caused damage to the finished pools.  Summary judgment is therefore granted with respect to Exclusion l.

### iv.  *Exclusion j(6)*

Exclusion j(6)[3] bars coverage for "that particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  It "applies to any property [an insured] contracted to perform work on."  *Candid Corp. v. Assurance Co. of Am.*, No. CV054008138, 2007 WL 1120616, at * 3 (Conn. Super. Ct. Mar. 29, 2007) (citing *Miller v. Allstate Ins. Cos.*, 896 So.2d 499 (Ala. Civ. App. 2004); *Emp'rs Mut. Cas. Co. v. Pires*, 723 A.2d 295 (R.I. 1999); *Alverson v. Nw. Nat'l Cas. Co.*, 1997 SD 9 (1997); *Lusalon, Inc. v. Hartford Accident and Indem. Co.*, 400 Mass. 767 (1987)).  Exclusion j(6), however, expressly does not apply to "'property damage' included in the 'products-completed operations hazard'" – i.e., completed work not in the insured's possession.  CGL Policy, Section I.2(j)(6).  Thus, it is "intended to exclude 'property damage' that directly or consequentially occurs from the faulty workmanship of the insured and its contractors/subcontractors (i.e., work that 'was incorrectly performed') *while the work is ongoing*."  *Advantage Homebuilding, LLC v. Maryland Cas. Co.*,

---

[3] Harleysville also includes Exclusion j(5) in its complaint, but does not contest the inapplicability of that exclusion in its summary judgment papers.  Nevertheless, it is clear that Exclusion j(5), which exempts from coverage "property damage" on "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations" does not apply, because Paramount is not performing any operations on real property.

470 F.3d 1003, 1012 (10th Cir. 2006) (emphasis added) (citing Robert J. Franco, *Insurance Coverage For Faulty Workmanship Claims Under Commercial General Liability Policies*, 30 Tort & Ins. L.J. 785, 796 (1995) ("Exclusion j(6) . . . is intended to bar defective workmanship claims.")).

Paramount performed no "work" on the pools.  As Harleysville concedes, Paramount's "work" was complete the moment it delivered the shotcrete to the construction site.  No property damage occurred until well after that time, when the pools cracked and began to leak. Accordingly, Exclusion j(6) does not apply, and summary judgment is granted with respect to this exclusion.

v.  *Exclusion m*

Exclusion m eliminates coverage for "property damage" to "'impaired' property or property not physically injured" that arises out of "a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'" or "a delay or failure to perform a contract."  CGL Policy, Section I.2(m).  "Impaired property" is defined as:

tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

(a) It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

(b) You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

A.  the repair, replacement, adjustment, or removal of "your product" or "your work"; or
B.  Your fulfilling the terms of the contract or agreement.

*Id.* Section V.8.  Exclusion m does not apply to "loss of use of other property arising out of sudden and accidental physical injury to your product after it has been put to its intended use."

"[T]he 'Impaired Property' exclusion is intended to prevent CGL policies from protecting against the insured's own faulty workmanship or product." *Fireman's Fund*, 2008 WL 4066096, at * 11.  Here, the completed pools are tangible property that cannot be used because they incorporate Paramount's product that is now known to have been defective.[4]  And, unlike in the definition of "occurrence," there is no "continuous or repeated exposure" clause in Exclusion m; the accident causing injury must have been "sudden."  *See, e.g.*, *Futura Coatings, Inc.*, 993 F. Supp. at 1264 ("Futura's argument that the 'sudden and accidental' exception to the 'impaired property' exclusion applies is without merit. . . . Here, the alleged cracking and peeling of the Futura coating was not sudden and accidental, but became apparent only as time passed after application."); *Semtech Corp. v. Royal Ins. Co. of Am.*, No. CV 03-2460 GAF PJWX, 2005 WL 6192907, at *13 (C.D. Cal. Oct. 11, 2005) (holding that "slow degradation precludes a finding of 'sudden' injury").  Nothing in the record demonstrates that the pools cracked suddenly – rather, it was deterioration over time that did them in.

Exclusion m, however, only applies to impaired property that can be restored to use through removal of the insured's defective product.  *See Sokol and Co. v. Atlantic Mut. Ins. Co.*, 430 F.3d 417, 423 (7th Cir. 2005) (Exclusion m barred coverage because removal of the

---

[4] Neither the Second Circuit nor the Connecticut Supreme Court has addressed whether the definition of "impaired property" encompasses property that has been physically injured by the insured's defective product, as the pools have here, or is limited to property that simply has lost its use due to incorporation of the insured's product. Courts interpreting identical "impaired property" exclusions, however, have reached differing conclusions. *Compare, e.g.*, *Grayson*, 2008 WL 2278593, at * 6 ("'Impaired property' is property damaged, because of a loss of use and not a physical injury, resulting from its inclusion of the insured's defective product . . . ."), *and Stewart Interior Contractors, L.L.C. v. Metalpro Indus., L.L.C.*, 969 So. 2d 653, 664 (La. App. 4 Cir. Oct. 10, 2007) ("We find the 'impaired property' exclusion to be clear and unambiguous. The exclusion precludes coverage for damage to property that has not been physically injured or for which only loss of use is sought"), *with Crown Packaging*, 813 F. Supp. 2d at 1048 ("[T]he exclusion . . . applies even when there *is* physical damage. . . . If it is necessary to specify that the exclusion applies equally to property not physically injured, then 'impaired property' must include property which might be physically injured. The Policy's definition of 'impaired property' as tangible property that cannot be used, or is less useful, because it incorporates the insured's defective product does not rule out physical injury to the tangible property."). Either way, the pools are not impaired property, because they cannot be restored to use by repair, removal or replacement of Paramount's product; therefore, it is not necessary to decide this issue.

insured's defective peanut butter packets from cookie mix and insertion of new packets would restore the mix to use).  As a result, Exclusion m does not bar coverage in cases where the insured's defective product has been inextricably incorporated into a finished product, such that it is impossible to remove the component from the whole.  *See, e.g.*, *Sec. Nat. Ins. Co. v. GloryBee Foods*, *Inc.*, No. CIV. 09-1388-HO, 2011 WL 902635 (D. Or. Mar. 15, 2011); *Fireman's Fund*, 2008 WL 4066096, at *11 (distinguishing *Sokol* and denying the insurer's motion for summary judgment, because evidence in the record indicated that the insured's defective product might have caused irreparable damage); *Shade Foods*, 78 Cal. App. 4th at  866 ("[I]t is fanciful to suppose that the nut clusters composed of congealed syrups and diced nuts or the boxed cereal product containing the nut clusters could be somehow deconstructed to remove the injurious splinters and then recombined for their original use.");

This is not a case like *Sokol* where the insured's product – there, packets of peanut butter in a box of cookie mix – can simply be removed and replaced.  430 F.3d at 423.  Paramount's product, the liquid shotcrete, cannot be removed from the completed pools – it hardened and became an integral part of the pool walls.  The inconsistencies in the shotcrete mix, in turn, caused the concrete to harden in such a way that it did not properly bond with the other components of the pool, which ultimately caused the pool walls to crack and leak.  Moreover, even if Paramount's "product" can fairly be said to be the hardened concrete, the trial record establishes that removing or replacing the cracked parts of the pool walls did not fix the pools. Therefore, the pools are not "impaired property" and summary judgment is granted with respect to Exclusion m.

> vi.   *Exclusion n*

Exclusion n is called the "sistership exclusion" and it applies to any "recall of products, work or impaired property."  CGL Policy, Section I.2(n).  Exclusion n protects insurance

companies against liability for the costs of recalls.  *See, e.g.*, *Forest City Dillon, Inc. v. Aetna Cas. & Sur. Co.*, 852 F.2d 168, 173 (6th Cir. 1988).  The clause excludes "damages claimed for any loss" if a "product . . . is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."  CGL Policy, Section I.2(n); *Travelers Indem. Co. v. Acadia Ins. Co.*, No. 1:08-CV-92, 2009 WL 1320965, at *8 n.7 (D. Vt. May 8, 2009) ("The 'sistership exclusion' deals with withdrawing or recalling damaged property from the market . . . .").  "Insurance companies . . . developed the 'sistership' clause to make clear that, while they intended to pay for damages caused by a product that failed, they did not intend to pay for the costs of recalling products containing a similar defect that had not yet failed."  *Forest City Dillon*, 852 F.2d at 173.

Harleysville asserts that R.I Pools has effectively "recalled" its shotcrete from the market. But this argument fails, because no "recall" occurred in this case.  "[T]he sistership exclusion does not apply to a product that has failed, but only to a 'sister' product withdrawn after failure of the first product.'"  *Am. Home Assurance v. Libbey Owens Ford Co.*, 786 F.2d 22, 25 (1st Cir. 1986); *Forest City Dillon*, 852 F.2d at 173; *Gulf Miss. Marine Corp. v. George Engine Co., Inc.*, 697 F.2d 668, 674 (5th Cir. 1983); *Imperial Cas. & Indem. Co. v. High Concrete Structures, Inc.*, 858 F.2d 128, 136 n. 9 (3d Cir.1988) ("Sistership provisions . . . do not exclude coverage of damages arising from a defective product when no sister products are involved."); *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir.1982); *Fireman's Fund*, 2008 WL 4066096, at * 12 (finding Seventh Circuit's conclusion in *Sokol* that Exclusion n barred coverage inapplicable because that case involved preventative measures, whereas in the case before the court, the product had already caused damage).

Here, no "sister" product was recalled.  Paramount seeks coverage for the damage actually caused by its defective product; it does not seek coverage for the removal of its defective shotcrete from the market.  Therefore, Exclusion n does not bar coverage in this case.

C.  The Number of Occurrences

As a final matter, Harleysville argues that even if there was "property damage" caused by an "occurrence," and no exclusion applies, the damage all flowed from one occurrence – the production of faulty shotcrete.  The law is clear, though, that the "occurrence" is the "unfortunate event" that causes injury and not the cause of that event.  *Metropolitan Life Ins. Co.*, 255 Conn. at 316; *Commercial Contractors Corp.*, 152 Conn. at 42-43.  Applying this test in *Metropolitan Life*, the Connecticut Supreme Court held that a chemical company injured people with each instance of exposure to asbestos even though it had only produced the material once.  255 Conn. at 305.  The "occurrence" was "each claimant's initial exposure to asbestos, rather than Metropolitan's alleged failure to warn."  *Id*; *see also Travelers Cas. v. Netherlands Ins. Co.*, No. CV094045937S, 2012 WL 2548867, at *6 (Conn. Super. Ct. June 1, 2012) (citing *Metropolitan Life* and holding that plain reading of CGL policy indicated that water leaking through masonry and causing physical injury to property within constituted "occurrence," not faulty performance of masonry).

A similar dynamic is at work in this case.  Paramount habitually manufactured defective shotcrete, but that shotcrete caused discrete harm each time its use in a pool caused the pool to crack and leak, thereby ruining the finished product it helped to hold together.[5]  *See, e.g.,*

---

[5]Although the failure of each pool was a separate "occurrence," Harleysville may be correct that some of the "occurrences" took place outside the policy period.  The existence of coverage for each separate occurrence will depend on when that "occurrence" took place – a potentially complex issue given that in most of the pools, the cracking appears to have occurred sometime during the harsh winter months, when the pools were drained and covered.  That is a question of fact, not law, though, and it is not to be resolved on summary judgment.  *See Travelers Prop. Cas. Co. of Am. v. Laticrete Int'l, Inc.*, No. CV044002006S, 2006 WL 2349079, at *3-4 (Conn.

*Travelers Cas.*, 2012 WL 2548867, at *6.  All of Paramount's prior mistakes; its bad formula, reckless management, and disregard for industry standards, were just steps in a chain of events that ended in the company's defective product destroying swimming pools.  There were nineteen separate occurrences here and, to the extent that these occurrences caused "property damage" and were otherwise covered under the scope and temporal limits of the CGL policy, Harleysville must cover the costs of each separate injury to each individual pool.

## IV.    Conclusion

For the foregoing reasons, Paramount and R.I. Pools' motions (docs. # 78 and 94) are GRANTED with respect to the issue of coverage, the number of occurrences, and the inapplicability of Exclusions k, l, j(6), m and n, and DENIED with respect to the applicability of Exclusion a.

It is so ordered.

Dated at Bridgeport, Connecticut, this 31st day of March 2014.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

Super. Ct. July 27, 2006) (denying summary judgment where "the triggering event, water exposure, 'possibly' occurred within the coverage period").